UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

EBENEZER  PANNIKADAVIL,

                              Plaintiff,

-against-

NYU LANGONE MEDICAL CENTER,
NYU LANGONE  HEALTH SYSTEM,
NYU LANGONE HOSPITALS,
 and SASHA D. PALO-CABASE,
Individually,

                             Defendants.

-------------------------------------------------------------------x

Index No.

**COMPLAINT and JURY DEMAND**

Plaintiff Ebenezer Pannikadavil, ("Plaintiff"), by his attorney Anne Donnelly, hereby alleges, upon information and belief against NYU LANGONE MEDICAL CENTER, NYU LANGONE  HEALTH SYSTEM,  NYU LANGONE HOSPITALS ("NYU"), and SASHA D. PALO-CABASE, Individually,  collectively "Defendants" as follows:

(I) INTRODUCTION

1.      Plaintiff Ebenezer Pannikadavil brings this action against the Defendants for damages caused by Defendants' wrongful termination of Plaintiff in retaliation for taking protected leave under §102 of the Family and Medical Leave Act of 1993.

2.      Plaintiff Ebenezer Pannikadavil also brings this action against the Defendants for damages caused by Defendants' discrimination on the basis of disability (including denial of a Reasonable Accommodation), age, and for retaliation and hostile work environment ("HWE") pursuant to the New York State Human Rights Law, § 296(1) (a) *et seq.* ("NYSHRL") and the New York City Human Rights Law, §8-107, *et seq.* of the Administrative Code ("NYCHRL").

3.      Plaintiff seeks back pay, front pay, liquidated damages, interest, attorney's fees, and all other legal and equitable relief to redress the deprivation of rights secured to Plaintiff by the

1

FMLA, the NYSHRL and the NYCHRL.

## (II) JURISDICTION

4.     Jurisdiction is conferred upon the Court by 28 U.S.C. §§ 1331, 1343 and 1367, and 42 U.S.C. Section 12101, et seq., as amended.

## (III) VENUE

5.     Venue lies in the Southern District of New York in that the unlawful actions complained of and the records relevant to such practices are maintained and administered within this district.

## (IV) EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.     Plaintiff has fully complied with all the prerequisites to obtain jurisdiction.

## (V) THE PARTIES

7.     Plaintiff, a male citizen of United States, was and is a resident of New Jersey, and was employed at Defendants NYU in the City and State of New York.

8.     Plaintiff was an eligible employee as that term is understood within the FMLA, NYSHRL and the NYCHRL.

9.     Defendant NYU is a hospital.

10.     Defendant NYU is an "employer" as that term is understood within the FMLA, NYSHRL and the NYCHRL.

11.     Defendant PALO was a Laboratory Manager in the Department of Clinical Laboratories – Hematology at NYU,  an employee of NYU, and Plaintiff's supervisor and manager.

12.     Plaintiff was employed at NYU at their site  whose address is  NYU Langone Health, Tisch Building, 560 First Avenue, H330, New York, NY 10016.

<u>(VI) STATEMENT OF FACTS</u>

**<u>2019 to 2022</u>**

13.    In August 2019, Defendant NYU hired Plaintiff as a Clinical Laboratory Technologist in Laboratory/Hematology.

14.    Plaintiff was born in 1961.

15.    Plaintiff was fully qualified for his position.

16.    Plaintiff worked in a laboratory.

17.    Plaintiff's job duties were set out in the job description which he received after being hired.

18.    His duties included but were not limited to: (a) testing and analyzing patient specimens; (b) reviewing and verifying test results, and reporting same to doctors; (c) performing functions for Quality Control ("QC") and Quality Assurance ("QA"); (d) advising doctor/nurse if there is any critical patient report; and (e) regulatory compliance.

19.    Plaintiff worked the midnight to 8:00 shift.

20.    On the midnight to 8:00 shift there was no laboratory Supervisor.

21.    On the midnight to 8:00 shift Plaintiff worked independently.

22.    The midnight to 8am shift was understaffed.

23.    As a result of the understaffing, Plaintiff covered multiple lab stations.

24.    Plaintiff worked 35 hours per week and worked overtime.

25.    Plaintiff received an annual pay raise.

26.    Plaintiff received compliments on his work from his supervisors, his fellow employees, and his clients, and generally met and/or exceeded defendant's legitimate job performance expectations.

27.    Plaintiff was a member of the Union 1199, and as such, he was entitled to the protections provided by same.

28.    Plaintiff's Union Organizer was Miguel Santana, and the union delegate was Frank Miller.

29.    Plaintiff's supervisor was Jackson Chue, and he supervised and monitored the daily operations in the laboratory and prepared the appraisals for the employees.

30.    Plaintiff received a 6-month successful probationary Performance Evaluation prepared by lab supervisor Jackson Chue.

31.    Plaintiff received a successful Annual Performance Evaluation in 2020 of prepared by lab supervisor Jackson Chue

32.  Plaintiff received a successful Annual Performance Evaluation in 2021 of prepared by lab supervisor Jackson Chue

33.  In approximately 2021, Defendant Palo was hired to the position of Hematology Laboratory Manager

34.  On or early year 2022, supervisor Jackson Chue was fired by Palo.

35.  Chue was over sixty years old.

36.  Ms. Rita Frenzia, the evening supervisor, was fired by Palo.

37.  Frenzia was over sixty years old.

38.  After Chue left, there was no steady supervisor in the hematology laboratory until the end of 2023.

39.  Palo took on the role of supervisor and manager.

## PLAINTIFF IS DISCRIMINATORILY HARASSED BY PALO

**2022.**

40.    In 2022, Defendant Palo became Plaintiff's manager.

41.    Plaintiff's supervisor and manager at all relevant times was Defendant Palo.

42.    In 2022, Defendant Palo wrote Plaintiff's performance evaluations.

43.    In 2022, Palo began to make comments about Plaintiff's age.

44.    For example, she would ask him, "*Roy, when are you planning to retire*?"


**November 3, 2022 - Plaintiff Makes his FIRST Complaint to about Harassment by Palo**

45.    On or about November 3, 2022, Plaintiff specifically requested Palo to keep his performance evaluation in a sealed envelope and hand it to Manager Yadira Ortiz.

46.    Plaintiff sees Yadira Ortiz in the morning at the end of his shift, and he intended to pick it up from her.

47.    Despite Plaintiff's requests, Palo left Plaintiff's performance review out in the open on the main printer near the lab, and it was noticeable for public to see it.

48.    Plaintiff was later informed that many people in the office saw and read his performance evaluation.

49.    Eventually the night lead technician, Joe, found it and put it in an envelope, and handed it to Plaintiff the following day.

50.    Plaintiff was humiliated because Palo had given him his worst ever performance review while he was at NYU.

51.    Plaintiff emailed Palo and informed her of the situation, imploring her, "Please don't leave my personal document it in the public. Is this situation part of HIPAA

regulation?"

52.    On November 4, 2022, Plaintiff made his first complaint about Palo.

53.    Plaintiff emailed to his union rep, Laura Goodwin, with the subject matter, "*Fw: Unfair posting my performance Review report. in public.*"

54.    Plaintiff headline the email, " Unfair and embarrassing annual review report left for public ."

55.    He complained to the Union that Palo purposely created his performance s evaluation on the last day of the deadline and asked him to sign online from my home without informing him of the e contents.

56.    Plaintiff's Union never filed the grievance.


**March 2023 – Palo wrongly accuses Plaintiff and then Retaliatorily forces him to Retrain**

57.    On March 28, 2023, Palo wrongly accused Plaintiff of releasing a patient's platelet counts (CBC/PLT) to a doctor.

58.    Plaintiff denied it.

59.    The accusation was made over the laboratory speakerphone and was heard by morning shift staff.

60.    Multiple morning shift staff then came up to Plaintiff and enquired what was going on.

61.    Plaintiff was humiliated.

62.    Palo was not able to prove that Plaintiff had released the CBC results to the doctor.

63.    Plaintiff then contacted Sysmex America Inc hotline, the company assisting and monitoring our hematology analyzer in the lab who provided24/7 technical support in our laboratory.

64.    Plaintiff called their hotline for technical support and inquired about the spermine releasing time and the name of the appropriate technician who released the data to the doctor.

65.    Sysmex America Inc then sent Plaintiff an email confirming that his co-worker, Heather Calderone, released results.

66.    Palo did not apologize for accusing Plaintiff of something that he did not do.

67.    Following a co-worker Heather Calderone's error, Palo forced Plaintiff to retrain with the rest of the laboratory despite his 25 years' experience in the field.

68.    At the end of the training, Palo gave Plaintiff 20 unknown peripheral smears to identify the WBC, RBC and morphologies with platelet estimation, and 6 CAP proficiency slides to answer.

69.    Palo treated Plaintiff differently from other employees who are only given a couple of smears to   test their knowledge.

70.    Palo then kept Plaintiff in front of her computer screen and made his analyze pictures of cells and parasites.

71.    Palo then walked Plaintiff all over laboratory like a child and made plaintiff explain to all the analyzers the  system, functions and the methodologies.

72.    The retraining was very embarrassing for Plaintiff .

73.    Palo purposely embarrassed, humiliated and harassed Plaintiff in front of new  students and new dayshift employees.

**Plaintiff complains to Palo about her treatment of Him, and Palo retaliates by Giving Plaintiff a written warning.**

74.    On March 30, Plaintiff sent an email to Palo.

75.   Plaintff stated that he was upset about a number of things, including false accusations about the CBC, and of Palo accusing him over the laboratory speaker phone.

76.   Plaintiff also complained to Palo that she was not rotating him on a weekly basis and treating him differently than other staff. Plaintiff implored, "*Please try to treat me like other tech in the lab and rotate me on a weekly basis.*"

77.   Plaintiff also complained to Palo that she was threatening him with disciplinary actions since he made the initial complaint to her to HR in November 2022. He stated, "*Since I made the initial complaint to NYU HR, you are threatening me with disciplinary action. So please have a meeting with 1199 Union delegate Frank Miller and me to discuss this at your earliest convenience.*"

78.   Palo refused to meet with Plaintiff and 1199 Union delegate Frank Miller.

79.   After Plaintiff's first complaint to HR about Palo, Palo began to write him up for minor infractions.

80.   For example, Palo took Plaintiff to the Gerrard Kicks ("Kicks"), the Lab Director, and asked Kicks to write Plaintiff up for lateness.

81.   Kicks hesitated to write Plaintiff up.

82.   At Palo's insistence, Plaintiff was given a verbal warning by Kicks.

83.   Plaintiff was then given a written warning for time and attendance.

**April 12, 2023 - Plaintiff Makes his SECOND Complaint about Harassment by Palo**

84.   On April 12, 2023, Plaintiff sent an email to Beth Cooper of Human Resources, with the title, "Harassment and Retaliation."

85.   The email and attached word document detailed the previous complaint that Plaintiff had

made to HR on 11/3/22, and the retaliation from Palo that had resulted.

86.    For example, Palo retracted his overtime.

87.    For example, Palo shifted his schedule around without giving him notice.

88.    For example, Palo excluded Plaintiff from staff meetings.

89.    Once again, HR did not respond to Plaintiff's complaints.

90.    Once again, HR did not investigate Plaintiff's complaints.


**June 2023 to October 2023 - After Plaintiff complains to HR about Palo, Palo Gives Him Further Warning, and refuses to hire him to an open dayshift Position**

91.    Following Plaintiff's April 12, 2023, complaint to HR concerning Palo changing his schedule, Palo then wrote Plaintiff up for failing to adhere to the schedule changes.

92.    On or about August 31, 2023, Defendant Palo posted an open position for a Lab Technician on the dayshift.

93.    Plaintiff applied for the open position.

94.    Defendants refused to hire Plaintiff to the dayshift position.

95.    Defendants selected new and inexperience and younger employees with less experience and seniority than Plaintiff.

96.    In October 2023, Palo gave plaintiff two final warnings.

97.    One warning was for failure to follow an instruction by Palo and dishonestly claiming non receipt of instruction despite contrary evidence.

98.    The second final written warning was in regard to time and attendance, and poor and dishonest communication surrounding unauthorized delay in Plaintiff's return to work following bereavement leave.

99.    Plaintiff disputed both final warnings.

## PLAINTIFF TAKES FMLA LEAVE BECAUSE OF HARASSMENT BY PALO

100.    On November 15, 2023, Plaintiff became sick and ended up at NYU Emergency room with depression, hypertension and stress.

101.    Plaintiff's blood pressure was extremely high, so the ER doctor, Timothy Fong, kept him in ER until it subsided.

102.    On November 18, 2023, he returned to work.

103.    Plaintiff became increasingly sick, depressed, anxious and stressed. .

104.    On November 21, 2023, he applied for FMLA leave.

105.    Plaintiff was signed off on protected FMLA leave until February 21, 2024.

106.    Plaintiff's doctor, Dr. Kainth, completed his FMLA paperwork for NYU.

107.    Dr. Kainth diagnosed Plaintiff with anxiety and depression, hypertension and obstructive sleep apnea.

108.     Dr. Kainth stated that Plaintiff's major life activities were affected, including concentration, daytime sleepiness, panic disorder, palpitations and decreased focus.

## PLAINTIFF REQUESTS THE REASONABLE ACCOMMODATION OF MOVING TO THE DAY SHIFT AND IS DENIED IN RETALIATION

109.    Dr. Kainth recommended that Plaintiff be given the reasonable accommodation ("RA") of moving to the day shift.

110.    On his return to work, Plaintiff engaged in protected activity by requesting a Reasonable Accommodation for his disability.

111.    Under all applicable statutes, requesting a Reasonable Accommodation is a protected activity.

112.    Plaintiff informed his supervisors, NYU HR, his Union, Defendant Palo, and Director Gerrard Kicks, that he required a Reasonable Accommodation of moving to the day shift.

113.    Plaintiff knew that there were open positions available on the day shift.

114.    Plaintiff applied for the day shift.

115.    Plaintiff had seniority.

116.    Plaintiff's request for a Reasonable Accommodation was denied.

117.    Defendants refused to move Plaintiff to the day shift.

118.    Defendants  then hired new people to work the days shift.

119.    The new day shift workers hired by Defendants were substantially younger than Plaintiff.

120.    The new day shift workers hired by Defendants had less seniority than Plaintiff.

121.    Defendant NYU's  hiring of workers with less seniority than Plaintiff is a violation of Collective Bargaining Agreement ("CBA")

122.    Under the NYSHRL and the NYCHRL, "the first step in providing a reasonable accommodation is to engage in a *good faith interactive dialogue* [GFID] that assesses the needs of the disabled individual and the reasonableness of the accommodation requested. The interactive process continues until, if possible, accommodation reasonable to the employee and employer is reached". *See*, <u>*Chernov v Securities Training Corp*</u>., 146 A.D.3d 493, 44 N.Y.S.3d 439, 2017 N.Y. App. Div. LEXIS 121, 2017 NY Slip Op 00126, citing *Jacobsen (supra)*; *Phillips v City of New York*, 66 AD3d 170, 183, 884 NYS2d 369 [1st Dept 2009].

123.    Defendants did not enter into a *good faith interactive dialogue* with Plaintiff about his request for a RA, which is a violation of the NYSHRL and the NYCHRL.

124. Plaintiff was denied his request for reasonable accommodation of moving to the day shift.

125. The night shift has no Supervisor or Assistant Supervisor.

126. The night shift is understaffed.

127. Plaintiff was often placed on a schedule to cover multiple stations.

128. Returning Plaintiff to the night shift would be detrimental to Plaintiff's health.


## IN FEBRUARY 2024, PLAINTIFF RETURNS TO WORK and IS TERMINATED

129. Defendants used New York Life Group Benefits Solutions to organize, administer and keep track of Plaintiff's FMLA leave.

130. Nevertheless, Defendant Palo constantly asked Plaintiff for doctor's notes.

131. Dr. Kainth provided Plaintiff with a medical note dated November 21, 2023, with a return-to-work date of December 8, 2023.

132. Dr. Kainth provided Plaintiff with a medical note dated November 21, 2023, with a return-to-work date of December 11, 2023.

133. Dr. Kainth provided Plaintiff with a medical note dated December 19, 2023, with a return-to-work date of February 12, 2024.

134. Dr. Kainth provided Plaintiff with a medical note dated December 19, 2023, with a return-to-work date of February 13, 2024.

135. Plaintff gave all of these notes to Defendant Palo.

136. Plaintiff returned to work on February 21, 2024.

137. On February 27, 2024, Plaintff was terminated for falsifying his notes from Dr. Kainth.

138. Plaintiff protested vehemently.

139. On March 11, 2024, Dr. Kainth personally sent a handwritten note to NYU, explaining

that all corrections to the medical notes had been made by his office, and not by Plaintiff.

140.    Dr. Kainth also sent a typed note to the same effect.

## PLAINTIFF FILES A UNION GRIEVANCE

141.    After Plaintiff was terminated, his Union filed a grievance.

142.    On July 10, 2024, a Grievance Hearing was held via Webex.

143.    At the hearing, Dr. Kainth's explanation of the errors on the return-to-work medical notes were explained.

144.    Nobody at the hearing called Dr. Kainth to ask questions about his letter.

145.    Nobody at the hearing called Dr. Kainth to confirm that his own office had made changes to Plaintiff's medical note, and that Plaintiff had not made the changes.

146.    In the hearing investigation document it was noted that, " Exhibits A and B (the return to work notes from Dr. Kainth) differ from Exhibit C (the return to work notes from Dr. Kainth) , despite all supposedly being RTW notes from the same practice, in the following ways: (1) format of the note itself; (2) Practitioners signature; (3) telephone number of the practice.

147.    Nobody at the hearing called Dr. Kainth to ask questions about format of the note itself.

148.    Nobody at the hearing called Dr. Kainth to ask questions about Dr. Kainth's own signature.

149.    Nobody at the hearing called Dr. Kainth to ask questions about the telephone number of the practice.

150.    In a letter dated August 21, 2024,  Union 1199 informed Plaintiff that Management had denied his grievance at the Third Step.

151.    On December  9, 2024, NYU HR denied Plaintiff's complaint.

152.    Defendants refused to reinstate Plaintiff.

13

**Plaintiff Can Show Retaliation, Nexus and Pretext**

153.    Defendants unlawfully retaliated against and terminated Plaintiff because he had taken FMLA-protected leave.

154.    Plaintiff took FMLA-protected leave on November 21, 2023.

155.    Plaintiff returned from FMLA protected leave on February 21, 2024.

156.    Plaintiff was fired on February 27, 2024.

157.    Plaintiff was fired within six days of returning from FMLA-protected leave, which gives the required nexus.

158.    Plaintiff's taking of his FMLA-protected leave constituted a negative factor in the decision to terminate him.

159.    All of the allegations of forging the RTW notes are pretext for FMLA retaliation.

160.    All of the allegations of forging the RTW notes are pretext for discrimination.

161.    All of the allegations of forging the RTW notes are pretext for retaliation.

162.    At no time was the Plaintiff given any prior oral or written warning that taking FMLA–protected leave would result in the loss of his job.

163.    At no time was the Plaintiff given any prior oral or written warning that any action she had taken, or had omitted, would result in the loss of his job.

**Damages**

164.    As a proximate result of Defendant's conduct, Plaintiff has been deliberately and/or intentionally and/or recklessly caused to suffer emotional distress including extreme anxiety,

emotional upset humiliation; caused to suffer extreme financial hardship: caused to suffer ill health including anxiety and depression; caused to suffer retaliation and punishment for taking FMLA protected leave.

165.    Because Defendants' discrimination of Plaintiff as described here was done with oppression, malice, and/or a reckless or conscious indifference to Plaintiff's protected rights, Plaintiff seeks punitive damages.

**Liability of the Parties**

166.    Defendant Palo is an employee, agent and servant of Defendant NYU.

167.    Palo acted within the scope of her employment, in furthering the business interests of the Defendant NYUs.

168.    Defendant NYUs instigated, controlled, directed or ratified employee Palo's acts as alleged here.

169.    Defendant NYU committed, were aware of, authorized and/or condoned the discriminatory and unlawful behavior against Plaintiff.

170.    The actions complained of here were committed intentionally by Defendants and constitute a policy and practice of discrimination.

171.    The Plaintiff was shocked and extremely upset to be terminated from her employment after five years of consistent and excellent job performance.

172.    Plaintiff has suffered loss of income and benefits as a result of his wrongful termination.

**Doctrine of Continuing Violations**

173.    The doctrine of "continuing violation" applies to Plaintiff's case. "The continuing

violation doctrine applies when a plaintiff challenges not just one incident of conduct violative of [an act], but an unlawful practice that continues into the limitations period." *Grimes*, 785 F. Supp. 2d at 291-92 (internal quotation and citation omitted). For a statute of limitations to be extended under the continuing violation doctrine, "a plaintiff must demonstrate that the alleged discrimination was 'not just an isolated violation, but an ongoing policy of discrimination which extend[s] into the limitations period.'" *Favourite v. 55 Halley St., Inc.*, 381 F. Supp. 3d 266, 278-79 (S.D.N.Y. 2019) (additional citation omitted) (quoting *Clement v. United Homes, LLC*, 914 F. Supp. 2d 362, 373 (E.D.N.Y. 2012)).

174.    "Where there are continuing violations that give rise to a claim of a discriminatory policy, the statute of limitations period does not begin to run until the end of the 'last asserted occurrence' of a discriminatory policy." *Clement*, 914 F. Supp. 2d at 373 (additional citation omitted) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 363, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982)).

175.    Defendants' discrimination of Plaintiffs was an "*ongoing policy of discrimination,*" *Favourite*, 381 F. Supp. 3d at 278-79, which started in 2022 soon after his first complaint to HR on November 3, 2022, and continued through his second complaint to HR on April 12, 2023, ending with his termination on February 27, 2024.

## (VII)STATEMENT OF CLAIMS

### COUNT ONE: FMLA Retaliation

176.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

177.    Plaintiff was an "employee" of Defendant within the meaning of 29 U.S.C. §2611(2)(A)

16

at the time that he requested FMLA-protected leave.

178.    Defendant was the "employer" of the Plaintiff within the meaning of 29 U.S.C. §2611(2)(A) at all times relevant to this action.

179.    Defendants willfully and intentionally violated the FMLA by retaliating against Plaintiff for taking his FMLA- protected leave.

180.    Plaintiff's taking of his FMLA-protected leave constituted a negative factor in the decision to terminate him.

181.    Defendants controlled in whole or in part Plaintiff's ability to take leaves of absence and personally took the decision to terminate Plaintiff's employment.

182.    Defendants' wrongful termination of Plaintiff's employment was in violation of 29 U.S.C. §2615 et seq.

183.    As a result of Defendants' violation of Plaintiff's rights under the FMLA, Plaintiff seeks all available damages as she is entitled to under FMLA, including without limitation, (1) all monetary damages resulting from her wrongful termination; (2)interest on that amount; (3)liquidated damages in the amount equal to the sum of her actual damages and interest; (4) Plaintiff's reasonable attorney's fees, Plaintiff's reasonable expert witness fees and all other costs and expenses associated with the action.

## COUNT TWO: DISABILITY DISCRIMINATION, HARASSMENT AND RETALIATION
### (NYSHRL)

184.    The allegations in the preceding paragraphs are repeated here as if fully stated.

185.    Defendants intentionally discriminated, harassed and retaliated against Plaintiff because of his disability in violation of the NYSHRL.

186.    Plaintiff requested a Reasonable Accommodation.

187. Defendants did not enter into a *good faith interactive dialogue* with Plaintiff about his request for Reasonable Accommodation, which is a violation of the NYSHRL.

188. Defendants denied Plaintiff's request for a Reasonable Accommodation.

189. The request for a Reasonable Accommodation is protected activity.

190. Defendants retaliated against Plaintiff for requesting a Reasonable Accommodation.

191. Defendants fired Plaintiff because of his disability.

192. Defendants intentionally retaliated against Plaintiff for the sum of his protected activity, which included filing formal complaints of disability discrimination, harassment and hostile work environment, and filing a request for a reasonable accommodation, with Defendants' HR Department, his Union, and with his managers.

193. Defendant Palo personally directed the retaliatory conduct and also aided in and abetted the retaliation suffered by Plaintiff.

194. Plaintiff suffered damages as a result of Defendants' discriminatory conduct.

195. Defendants' actions were carried out with reckless disregard and in violation of Plaintiff's rights.

196. Because Defendants' discrimination of Plaintiff as described here was done with oppression, malice, and/or a reckless or conscious indifference to Plaintiff's protected rights, Plaintiff seeks punitive damages.

197. Plaintiff has thereby been damaged in an amount as yet undetermined but exceeding $1,000,000.

## COUNT THREE: AGE DISCRIMINATION, HARASSMENT AND RETALIATION
### (NYSHRL)

198. The allegations in the preceding paragraphs are repeated here as if fully stated.

199.    Defendants intentionally discriminated, harassed and retaliated against Plaintiff because of his age in violation of the NYSHRL.

200.    Plaintiff suffered damages as a result of Defendants' discriminatory conduct.

201.    Defendants' actions were carried out with reckless disregard and in violation of Plaintiff's rights.

202.    Because Defendants' discrimination of Plaintiff as described here was done with oppression, malice, and/or a reckless or conscious indifference to Plaintiff's protected rights, Plaintiff seeks punitive damages.

203.    Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $1,000,000.

### COUNT FOUR: DISABILITY DISCRIMINATION, HARASSMENT AND RETALIATION
### (NYCHRL)

204.    The allegations in the preceding paragraphs are repeated here as if fully stated.

205.    Defendants intentionally discriminated, harassed and retaliated against Plaintiff because of his disability in violation of the NYCHRL.

206.    Plaintiff requested a Reasonable Accommodation.

207.    Defendants did not enter into a *good faith interactive dialogue* with Plaintiff about his request for a Reasonable Accommodation, which is a violation of the NYCHRL.

208.    Defendants denied Plaintiff's request for a Reasonable Accommodation.

209.    The request for a reasonable Accommodation is protected activity.

210.    Defendants retaliated against Plaintiff for requesting a Reasonable Accommodation.

211.    Defendants fired Plaintiff because of his disability.

212.    Defendants intentionally retaliated against Plaintiff for the sum of his protected activity, which included filing formal complaints of disability discrimination, harassment and hostile

work environment, and filing a request for a reasonable accommodation, with Defendants' HR Department, his Union, and with his managers.

213.    Defendant Palo personally directed the retaliatory conduct and also aided in and abetted the retaliation suffered by Plaintiff.

214.    Plaintiff suffered damages as a result of Defendants' discriminatory conduct.

215.    Defendants' actions were carried out with reckless disregard and in violation of Plaintiff's rights.

216.    Because Defendants' discrimination of Plaintiff as described here was done with oppression, malice, and/or a reckless or conscious indifference to Plaintiff's protected rights, Plaintiff seeks punitive damages.

217.    Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $1,000,000.

## COUNT FIVE: AGE DISCRIMINATION, HARASSMENT AND RETALIATION
### (NYCHRL)

218.    The allegations in the preceding paragraphs are repeated here as if fully stated.

219.    Defendants intentionally discriminated, harassed and retaliated against Plaintiff because of his age in violation of the NYCHRL.

220.    Plaintiff suffered damages as a result of Defendants' discriminatory conduct.

221.    Defendants' actions were carried out with reckless disregard and in violation of Plaintiff's rights.

222.    Because Defendants' discrimination of Plaintiff as described here was done with oppression, malice, and/or a reckless or conscious indifference to Plaintiff's protected rights, Plaintiff seeks punitive damages.

20

223.    Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $1,000,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands that judgment be granted as follows:

a.    The amount sought for each cause of action;
b.    Lost wages;
c.    Compensatory damages;
d.    Attorney's fees and costs; and
e.    Punitive damages exceeding $1,000,000;
f.    An order enjoining Defendants from engaging in the wrongful practices alleged herein;
g.    Such other and further relief as the Court may deem just and proper.

Dated: New York, New York
February 27, 2026

Respectfully submitted,

Anne Donnelly /s/

Anne Donnelly, Esq. (AD5486)
**Attorney for the Plaintiff**
Law Office of Anne Donnelly
43 West 43rd Street, Ste. 117
New York, New York 10036-7424
Tel.: (914) 437-0103
Fax: (914) 219-3145